FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAN 0 3 2012

JAMES R. LARSEN, CLERK
_____DEPUTY
YAKIMA, WASHINGTON

Michael C. Ormsby
United States Attorney
Eastern District of Washington
Tyler H.L. Tornabene
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | 11-CR-6080-LRS |
| vs. | ) ) | Plea Agreement |
| CHRISTIAN DAVEL CAREAGA, | ) ) | |
| Defendant. | ) ) | |

Plaintiff, United States of America, by and through Michael C. Ormsby, United States Attorney for the Eastern District of Washington, and Tyler H.L. Tornabene, Assistant United States Attorney for the Eastern District of Washington, and Defendant CHRIRSTIAN DAVEL CAREAGA  and the Defendant's counsel, Peter L. March, agree to the following Plea Agreement:

1.    Guilty Plea and Maximum Statutory Penalties:

The Defendant, CHRIRSTIAN DAVEL CAREAGA, agrees to waive indictment by a grand jury and agrees to plead guilty to an Information, November 21, 2011, charging the Defendant with Conspiracy to Defraud the Government with Respect to Claims, in violation of 18 U.S.C. § 286.  The Defendant understands that this is a Class D felony which carries a maximum penalty of: not more than a 10 year term of imprisonment; a fine not to exceed $250,000; not

Plea Agreement - 1

1  more than a 3 year term of supervised release; restitution; and a $100.00 special

2  penalty assessment.

3    The Defendant, CHRIRSTIAN DAVEL CAREAGA, understands that a

4  violation of a condition of supervised release carries an additional penalty of re-

5  imprisonment for all or part of the term of supervised release without credit for

6  time previously served on post-release supervision.

7    2. The Court is Not a Party to the Agreement:

8    The Court is not a party to this Plea Agreement and may accept or reject this

9  Plea Agreement.  Sentencing is a matter that is solely within the discretion of the

10  Court.  The Defendant understands that the Court is under no obligation to accept

11  any recommendations made by the United States and/or by the Defendant; that the

12  Court will obtain an independent report and sentencing recommendation from the

13  U.S. Probation Office; and that the Court may, in its discretion, impose any

14  sentence it deems appropriate up to the statutory maximums stated in this Plea

15  Agreement.

16    The Defendant acknowledges that no promises of any type have been made

17  to the Defendant with respect to the sentence the Court will impose in this matter.

18  The Defendant understands that the Court is required to consider the applicable

19  sentencing guideline range, but may depart upward or downward under the

20  appropriate circumstances.

21    The Defendant also understands that should the sentencing judge decide not

22  to accept any of the parties' recommendations, that decision is not a basis for

23  withdrawing from this Plea Agreement or a basis for withdrawing this plea of

24  guilty.

25    3. Waiver of Constitutional Rights:

26    The Defendant, CHRIRSTIAN DAVEL CAREAGA, understands that by

27  entering this plea of guilty the Defendant is knowingly and voluntarily waiving

28  certain constitutional rights, including:

Plea Agreement - 2

(a).    The right to a jury trial;

(b).    The right to see, hear and question the witnesses;

(c).    The right to remain silent at trial;

(d).    The right to testify at trial; and

(e).    The right to compel witnesses to testify.

While the Defendant is waiving certain constitutional rights, the Defendant understands the Defendant retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if the Defendant cannot afford to hire an attorney. The Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

4.    Elements of the Offense:

The United States and the Defendant agree that in order to convict the Defendant of Conspiracy to Defraud the Government with Respect to Claims in violation of 18 U.S.C. § 286, the United States would have to prove beyond a reasonable doubt the following elements[1]:

> First, that on or between January 1, 2004, and November 19, 2008, in the Eastern District of Washington, the Defendant, CHRISTIAN

---

[1]The Defendant and the United States agree that current legal authority binding on this Court does not require proof of an overt act in order to sustain a conviction under 18 U.S.C. § 286. The Defendant and the United States further agree that if authority binding on this Court ever does require proof of an overt act to sustain a conviction under 18 U.S.C. § 286, that the United States could prove beyond a reasonable doubt that the Defendant did in fact take an overt act in furtherance of the combination, conspiracy, or agreement in violation of 18 U.S.C. § 286 as charged in the Information.

Plea Agreement - 3

1    CAREAGA entered into an agreement, combination, conspiracy,

2    or any combination thereof, with at least one other person, to obtain

3    or aid in obtaining payment of claims against the United States

4    Department of Energy;

5    Second, that the claims were materially false, fictitious, or

6    fraudulent;

7    Third, that the Defendant, CHRIRSTIAN DAVEL CAREAGA, knew

8    at the time that the claims were materially false, fictitious, or

9    fraudulent;

10    Fourth, that the Defendant, CHRIRSTIAN DAVEL CAREAGA,

11    knew of the agreement, combination, conspiracy, or any combination

12    thereof, and intended to join it; and

13    Fifth, that the Defendant, CHRIRSTIAN DAVEL CAREAGA,

14    voluntarily participated in the agreement, combination, conspiracy, or

15    any combination thereof.

16    5.    Factual Basis and Statement of Facts:

17    The United States and the Defendant stipulate and agree that the following

18    facts are accurate; that the United States could prove these facts beyond a

19    reasonable doubt at trial; and these facts constitute an adequate factual basis for

20    CHRIRSTIAN DAVEL CAREAGA's guilty plea.  This statement of facts does

21    not preclude either party from presenting and arguing, for sentencing purposes,

22    additional facts which are relevant to the guideline computation or sentencing,

23    unless otherwise prohibited in this agreement.

24    CHRIRSTIAN DAVEL CAREAGA worked for CH2M Hill Hanford Group

25    Inc. ("CH2M Hill") as a Radiological Control Technician (RCT) from 1999 to

26    October of 2008.  CH2M Hill was a prime contractor for the United States

27    Department of Energy ("DOE") at the Hanford Nuclear Reservation ("Hanford")

28    located in southeastern Washington, in the Eastern District of Washington.  CH2M

Plea Agreement - 4

1   Hill was contracted by DOE to retrieve, treat, and dispose of radioactive waste

2   located at the "Tank Farms," at Hanford in 1999.  The CH2M Hill prime contract

3   was a cost plus reimbursement contract whereby CH2M Hill was fully reimbursed

4   by the United States through a DOE funded line of credit for the fully burdened

5   cost of labor allocable to the CH2M Hill prime contract (e.g. labor ostensibly not

6   the product of fraud or false statements).

7        All CH2M Hill employees who worked on the CH2M Hill prime contract

8   and were paid by the hour, including CHRIRSTIAN DAVEL CAREAGA, had to

9   enter their hours worked into an electronic system known as the Time Information

10  System ("TIS").  According to the CH2M Hill written procedures all hourly

11  employees, including CHRIRSTIAN DAVEL CAREAGA, were to input the time

12  they began work at the Tank Farms and the time that they ended a shift, among

13  other material pieces of information.  In order to receive a pay check for the hours

14  claimed employees, including CHRIRSTIAN DAVEL CAREAGA, had to

15  electronically submit the completed weekly information in TIS (referred to herein

16  as "a time card") to a direct supervisor.  Employees, including CHRIRSTIAN

17  DAVEL CAREAGA, would not get paid until and unless a direct supervisor, or

18  other authorized supervisory employee of CH2M Hill, electronically approved the

19  employee's time card on Monday of the following week.

20       According to the CH2M Hill written procedures, by submitting a time card

21  in TIS for approval by a supervisor CHRIRSTIAN DAVEL CAREAGA was

22  certifying that the information was true and correct.  According to the same

23  written procedures, by electronically approving CHRIRSTIAN DAVEL

24  CAREAGA's time card his direct supervisor, or other supervisory employee, was

25  further certifying that the information entered by CHRIRSTIAN DAVEL

26  CAREAGA, including the amount of hours worked, was true and correct.  CH2M

27  Hill then provided this information, along with other employees' information from

28  TIS, to DOE in order to justify, in part, the CH2M Hill draw down on the DOE

Plea Agreement - 5

1  line of credit. In this manner, the United States ultimately paid for all of

2  CHRIRSTIAN DAVEL CAREAGA's wages while employed at CH2M Hill. Had

3  DOE known that, as described below, any portion of CH2M Hill's labor costs

4  supposedly allocable to the CH2M Hill prime contract, including the hours falsely

5  claimed by CHRIRSTIAN DAVEL CAREAGA, were the product of the below

6  described time card fraud scheme and conspiracy it would not have authorized the

7  payments and would have sought a return of any amounts paid as a result of the

8  time card fraud scheme and conspiracy.

9      Upon first starting to work for CH2M Hill at the Tank Farms CHRIRSTIAN

10  DAVEL CAREAGA learned of the time card fraud scheme and conspiracy.

11  Specifically, it was accepted practice at CH2M Hill to claim more hours on a time

12  card than were actually worked. For instance, an employee working a swing shift

13  (4:30 pm to 12:30 am) could leave when the particular job justifying the overtime

14  was completed and claim the full eight hour shift even though the job had taken

15  significantly less than the full eight hours.

16      CHRIRSTIAN DAVEL CAREAGA learned of this accepted practice

17  through a variety of means. The accepted practice was so widespread that

18  CHRIRSTIAN DAVEL CAREAGA could easily observe that none of his fellow

19  RCTs, or other CH2M Hill hourly employees at the Tank Farms, stayed for a full

20  eight hour overtime shift. However, the time cards for these employees falsely

21  claiming a full eight hour shift were nonetheless routinely approved by CH2M Hill

22  supervisory employees who had themselves observed the hourly employees

23  routinely leaving well prior to the end of an eight hour shift. Moreover, many of

24  these approving CH2M Hill supervisory employees had themselves participated in

25  the routine practice of leaving prior to a full eight hour shift but claiming the full

26  eight hours when they had been non-supervisory employees of CH2M Hill.

27      In addition, direct supervisors of the RCTs would routinely indicate to the

28  RCTs that they supervised, including CHRIRSTIAN DAVEL CAREAGA when

Plea Agreement - 6

they were leaving in order to signal to the RCTs that it would soon be alright for
the RCTs to leave early and yet claim a full eight hours. In this manner, direct
supervisors were able to facilitate the time card fraud scheme and conspiracy
while at the same time attempting to retain the ability to plausibly deny actual
knowledge of the time card fraud being committed. Specifically, direct
supervisors of the RCTs, including direct supervisors of CHRIRSTIAN DAVEL
CAREAGA, would say particular phrases such as "why are you still here," and
"what are you guys still doing here," as the direct supervisor left. Yet, the same
direct supervisors would routinely approve the RCT time cards, including
CHRIRSTIAN DAVEL CAREAGA's time cards, falsely claiming that they had
stayed for another approximate eight hours. Accordingly, CHRIRSTIAN DAVEL
CAREAGA learned, in part through the behavior of others, that once the direct
supervisor had left the Tank Farms and the job being worked was completed, he
could leave and claim payment for the full eight hours rather than the actual time
worked.

    In addition, it was common knowledge among supervisory personnel at
CH2M Hill that overtime jobs were of varying lengths, that many jobs would often
take substantially less than eight hours to complete, and that employees, including
RCTs, routinely left the Tank Farms at the completion of those jobs.
CHRIRSTIAN DAVEL CAREAGA knew that this was common knowledge
among supervisory personnel at CH2M Hill and yet he was never admonished or
reprimanded in anyway for claiming full eight hour overtime shifts until he was
detected by law enforcement and the detection was brought to the attention of his
employer by law enforcement.

    Further, CHRIRSTIAN DAVEL CAREAGA's time cards clearly and
routinely showing a consistent leave time of 11:30 pm or 12:30 am on swing shift
overtime, were always approved by his direct supervisor and other supervisory
personnel allowing him to get paid for his falsely claimed hours. Additionally,

Plea Agreement - 7

despite the known reality of varying overtime job lengths, and the fact that many of the jobs would often take substantially less than eight hours, overtime shifts were nearly always offered by CH2M Hill management in eight hour blocks further encouraging employees to claim the full eight hours even if they did not work the full eight hours.

In addition, RCTs were not allowed to work more than 72 hours in a single week due, in part, to safety concerns. In order to ensure that the hours reported to have been worked on time cards never went over 72 hours for any single week direct supervisors of RCTs would instruct RCTs, including CHRIRSTIAN DAVEL CAREAGA, that if their reported hours were over the 72 hour limit they needed to falsely report those hours on the following week's time card.

Moreover, supervisors on particular jobs (known as Persons in Charge or "PICs") would state, at the beginning of the shift, "lets get this done so we can get out of here." Yet, on at least one occasion, after a job that took approximately two hours, two particular PICs advised the RCTs on that job, including CHRIRSTIAN DAVEL CAREAGA, that the RCTs should report a full eight hour shift. Further, PICs would explain to RCTs, including CHRIRSTIAN DAVEL CAREAGA, that the practice of allowing RCTs and other workers of CH2M Hill to be paid for a full eight hour shift when significantly less hours were worked was a practice condoned by CH2M Hill management as a way of providing a bonus to RCTs and other workers.

CHRIRSTIAN DAVEL CAREAGA would also discuss the practice of falsifying time cards with fellow RCTs employed at CH2M Hill. The product of those discussions was an understanding among those RCTs that unless and until PICs instructed the RCTs to record their actual hours worked they would continue to falsely recorded working a full eight hour shift.

CHRIRSTIAN DAVEL CAREAGA was aware that although it was an accepted practice and procedure at CH2M Hill to pay hourly employees, such as

Plea Agreement - 8

1 RCTs, for hours claimed but not actually worked, these procedures were not

2 reduced to writing and were contrary to the CH2M Hill written procedures.  In

3 fact, it was further accepted practice at CH2M Hill to engage in patterns designed

4 to avoid the detection of the time card fraud scheme and conspiracy by law

5 enforcement or CH2M Hill internal auditors who were institutionally separate

6 from CH2M Hill management and who routinely provided information to law

7 enforcement.

8       For instance, in May of 2008, CHRIRSTIAN DAVEL CAREAGA  became

9 aware of an incident whereby his direct supervisor received an anonymous tip that

10 his/her employees were not at the Tank Farms during an overtime shift.  Based on

11 the anonymous tip the direct supervisor, who had left for the day, went back to the

12 Tank Farms and confirmed that most if not all of the employees who were

13 supposed to be working overtime that night were no longer at the Tank Farms.

14 However, rather than engaging in any formal disciplinary action against the

15 employees the direct supervisor called the missing employees to ensure that they,

16 contrary to the normal practice of the time card fraud scheme and conspiracy,

17 made sure their time cards accurately reflected the time they left.  This action was

18 approved of by at least one person in CH2M Hill management above the level of

19 direct supervisor.

20       The following day CHRIRSTIAN DAVEL CAREAGA was told by his

21 direct supervisor, along with other employees, that in order to avoid detection

22 employees should not claim more hours than worked.  CHRIRSTIAN DAVEL

23 CAREAGA and his fellow RCTs heeded this advice until, in approximately June

24 or July of 2008,  resuming the standard practice of claiming a full shift while

25 working less. Specifically, as early as June 9, 2008, the same direct supervisor

26 who had received the anonymous tip resumed approving CHRIRSTIAN DAVEL

27 CAREAGA's time cards, which again falsely claimed, among other things, nearly

28 unvarying 12:30 am leave times for swing shifts, just as before.

Plea Agreement - 9

1     Upon law enforcement's discovery of the time card fraud scheme and
2  conspiracy CHRIRSTIAN DAVEL CAREAGA was told by other conspirators not
3  to provide information regarding the conspiracy to law enforcement.  Specifically,
4  CHRIRSTIAN DAVEL CAREAGA was told by a lead RCT, himself in charge of
5  calling out the overtime in eight hour blocks rather than in shorter increments
6  based on the actual hours needed, to not provide any information to the special
7  agents of the Department of Energy Office of Inspector General investigating the
8  time card fraud scheme and conspiracy.  CHRIRSTIAN DAVEL CAREAGA was
9  also told by a fellow RCT and union steward that he should not directly implicate
10  any other conspirators and that CHRIRSTIAN DAVEL CAREAGA and others
11  already apparently suspected by law enforcement should take the full blame for the
12  time card fraud scheme and conspiracy and thus protect the other conspirators.
13     In this manner, CHRIRSTIAN DAVEL CAREAGA agreed, combined, and
14  conspired with others, including his direct supervisors, to provide time cards
15  falsely claiming payment for hours not worked.  In providing the false information
16  intending to be paid for hours not worked CHRIRSTIAN DAVEL CAREAGA
17  acted with the intent to defraud.  The false information in CHRIRSTIAN DAVEL
18  CAREAGA's time cards was utilized by CH2M Hill to justify receiving money
19  from the United States.  The money paid to CHRIRSTIAN DAVEL CAREAGA
20  for hours he did not work but falsely claimed were ultimately paid by the United
21  States.
22     Between January of 2004 and October of 2008, CHRIRSTIAN DAVEL
23  CAREAGA would routinely leave on or before 9:00 pm on swing shift and yet
24  falsely certify on his time card that he had stayed and worked until 12:30 am, the
25  full eight hour swing shift, or would falsely claim to have worked a full shift when
26  in fact he had not.  During that same time frame CHRIRSTIAN DAVEL
27  CAREAGA claimed a total of 2,249.5 hours of overtime.  Pursuant to the time
28  card fraud scheme and conspiracy his direct supervisor and other supervisory

Plea Agreement - 10

1    personnel at CH2M Hill would knowingly approve of his false time card thereby

2    ensuring that CHRIRSTIAN DAVEL CAREAGA would be paid for hours not

3    worked and that, ultimately, the United States would pay for those falsely claimed

4    hours.

5         Based on the fully burdened cost of labor applicable to CHRIRSTIAN

6    DAVEL CAREAGA during these times the United States, through CH2M Hill,

7    paid CHRIRSTIAN DAVEL CAREAGA at least $90,000 for the overtime hours

8    he falsely claimed.

9         6.    Waiver of Inadmissibility of Statements:

10        The Defendant agrees to waive the inadmissibility of statements made in the

11   course of plea discussions with the United States, pursuant to Fed. R. Crim.

12   P. 11(f).  This waiver shall apply if the Defendant withdraws this guilty plea or

13   breaches this Plea Agreement.  The Defendant acknowledges that any statements

14   made by the Defendant to law enforcement agents in the course of plea discussions

15   in this case would be admissible against the Defendant in the United States's case-

16   in-chief if the Defendant were to withdraw or breach this Plea Agreement.

17        7.    The United States Agrees Not to File Additional Charges:

18        The United States Attorney's Office for the Eastern District of Washington

19   agrees not to bring any additional charges against the Defendant based upon

20   information in its possession at the time of this Plea Agreement and arising out of

21   Defendant's conduct involving illegal activity charged in the Information, unless

22   the Defendant breaches this Plea Agreement any time before or after sentencing.

23        8.    United States Sentencing Guideline Calculations:

24        The Defendant understands and acknowledges that the United States

25   Sentencing Guidelines (hereinafter "U.S.S.G.") are applicable to this case and that

26   the Court will determine the Defendant's applicable sentencing guideline range at

27   the time of sentencing.

28

Plea Agreement - 11

(a.)    Base Offense Level:

The United States and the Defendant agree that the base offense level for Conspiracy to Defraud the Government with Respect to Claims, violation of 18 U.S.C. § 286, is six (6). See U.S.S.G. §2B1.1(a)(2).

(b.)    Amount of Loss Calculation:

The United States and the Defendant agree that the amount of loss caused by the Defendant pursuant to the charged conduct is at least $90,000.  Therefore, the United States and the Defendant agree that, pursuant to U.S.S.G. §2B1.1(b)(1)(D), an eight (8) level upward adjustment in the offense level is appropriate.

(c.)    Acceptance of Responsibility:

If the Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit any obstructive conduct; accepts this Plea Agreement; and enters a plea of guilty no later than ~~December 23, 2011~~ January 3, 2012, the United States will move for a two (2) level downward adjustment in the offense level for the Defendant's timely acceptance of responsibility, pursuant to U.S.S.G. §3E1.1(a).

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, not recommend a downward reduction for acceptance of responsibility if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever.

Furthermore, the Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment, as a condition to this recommendation by the United States.

Plea Agreement - 12

(d.)    Final Offense Level:

The United States and the Defendant agree that if the Court establishes the base offense level at six (6), and increases the offense level by eight (8) levels due to the amount of loss being at least $90,000, and adjusts the offense level downward by two (2) levels for acceptance of responsibility, the Defendant's final adjusted offense level would be a twelve (12).

(e.)    Criminal History:

The United States and the Defendant have made no agreement and make no representations as to the criminal history category, which shall be determined after the Presentence Investigative Report is completed.

9.    Departures:

The Defendant intends to request a downward departure and/or variance from the sentencing guidelines. At this time, the Defendant is unable to articulate the basis for a downward departure or variance. The United States reserves its right to oppose any downward departure or variance consistent with the terms of this Plea Agreement.

10.    Substantial Assistance:

The United States agrees that at sentencing it will move pursuant to 18 U.S.C. § 3553(e), which gives the Court authority to sentence below the minimum established by statute so as to reflect the Defendant's substantial assistance in the investigation and prosecution of another, all in accordance with U.S.S.G. §5K1.1 (Substantial Assistance to Authorities), which provides as follows:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
>
> (a)    The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

Plea Agreement - 13

(1)  the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)  the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)  the nature and extent of the defendant's assistance;

(4)  any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5)  the timeliness of the defendant's assistance.

U.S.S.G. §5K1.1(a)(1)-(5).

The Defendant acknowledges that he has not completed providing substantial assistance at the time of the entry into this Plea Agreement and that the United States is not bound to move for a downward departure unless the Defendant provides information that is fully truthful and complete and that the Defendant testifies truthfully and completely at any hearing, trial, grand jury proceeding, deposition, or other court proceeding if called as a witness by any party. The Defendant understands that it may be necessary to continue his sentencing date in order to verify full compliance with this agreement.

The Defendant acknowledges that if he fails to complete his efforts to provide substantial assistance by refusing reasonable requests to meet with law enforcement agents (including attorneys for the United States Attorneys Office for the Eastern District of Washington and the Department of Justice), by providing false information or withholding information from agents, or by failing to testify completely, truthfully, and honestly, the United States is under no obligation to file a motion for a downward departure pursuant to 18 U.S.C. § 3553(e) or U.S.S.G. §5K1.1, and this agreement shall be considered breached and null and void. The United States may then prosecute the Defendant on all available charges, including making false statements and perjury.

Plea Agreement - 14

11.   <u>Incarceration</u>:

If the Defendant does not provide "substantial assistance," as set forth in Paragraph 10, supra, the United States agrees to recommend that the Court impose a sentence within the applicable guideline range.

12.   <u>Supervised Release</u>:

If the Court imposes a sentence of incarceration, the United States and the Defendant agree to recommend that the Court impose a two (2)-year term of supervised release to include the following special conditions, in addition to the standard conditions of supervised release:

(a.)  that the Defendant provide financial information, provide copies of Federal income tax returns and allow credit checks, at the direction of the Probation Officer; and

(b.)  that the Defendant shall disclose all assets and liabilities to the Probation Officer and shall not transfer, sell, give away, or otherwise convey or secret any asset, without the advance approval of the Probation Officer.

13.   <u>Criminal Fine in lieu of Restitution</u>:

The United States and the Defendant agree that in lieu of restitution under 18 U.S.C. § 3664, the Defendant stipulates and agrees to a fine amount of $90,000 under 18 U.S.C. § 3572.

14.   <u>Mandatory Special Penalty Assessment</u>:

The Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

15.   <u>Payments While Incarcerated</u>:

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, and if the Defendant is ultimately sentenced to any term of incarceration, the Defendant agrees to earn the money to pay toward

Plea Agreement - 15

1   these obligations by participating in the Bureau of Prisons' Inmate Financial

2   Responsibility Program.

3       16.   Additional Violations of Law Can Void Plea Agreement:

4       The Defendant and the United States agree that the United States may at its

5   option and upon written notice to the Defendant, withdraw from this Plea

6   Agreement or modify its recommendation for sentence if the Defendant commits

7   any violation of state, local, or federal law prior to the imposition of sentence.

8       17.   Appeal Rights:

9       In return for the concessions that the United States has made in this Plea

10  Agreement, the Defendant agrees to waive the right to appeal the sentence if the

11  Court imposes a prison term of not longer than 16 months, imposes a term of

12  supervised release of not longer than 2 years, imposes a fine of not more than

13  $90,000, and imposes a penalty assessment of not more than $100.  Should the

14  Defendant successfully move to withdraw from this Plea Agreement or should the

15  Defendant's conviction on the charge in the Information  be dismissed, set aside,

16  vacated, or reversed, this Plea Agreement shall become null and void; and the

17  United States may prosecute the Defendant on all available charges involving or

18  arising out of the Defendant's employment with CH2M Hill Hanford Group Inc.

19  Nothing in this Plea Agreement shall preclude the United States from opposing

20  any post-conviction motion for a reduction of sentence or other attack of the

21  conviction or sentence, including, but not limited to, proceedings pursuant to 28

22  U.S.C. § 2255 (writ of habeas corpus).

23      18.   Hyde Amendment Waiver:

24      The Defendant waives any claim under the Hyde Amendment, 18 U.S.C. §

25  3006A (Statutory Note), for attorney's fees and other litigation expenses arising

26  out of the investigation or prosecution of this matter.

27

28

Plea Agreement - 16

19.   Integration Clause:

The United States and the Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and the Defendant, and no other promises, agreements, or conditions exist between the United States and the Defendant concerning the resolution of the case. This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state or local authorities. The United States and the Defendant agree that this agreement cannot be modified except in a writing that is signed by the United States and the Defendant.

## Approvals and Signatures

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Michael C. Ormsby
United States Attorney

_____         __1/3/12_____
Tyler H.L. Tornabene                                    Date
Assistant U.S. Attorney

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened

Plea Agreement - 17

1  or forced me in any way to enter into this Plea Agreement. I am agreeing to plead

2  guilty because I am guilty.

3

4  _Christian Davel Careaga_ _____      _1/3/12_ _____

5  CHRIKSTIAN DAVEL CAREAGA            Date
   Defendant
   _Car 1/3/12_

6       I have read the Plea Agreement and have discussed the contents of the

7  agreement with my client. The Plea Agreement accurately and completely sets

8  forth the entirety of the agreement between the parties. I concur in my client's

9  decision to plead guilty as set forth in the Plea Agreement. There is no legal

10 reason why the Court should not accept the Defendant's plea of guilty.

11

12 _Peter X March_ _____            _1/3/12_ _____

13 Peter L. March                     Date
   Attorney for the Defendant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plea Agreement - 18